**Electronically Filed
Supreme Court
SCAP-19-0000449
22-FEB-2022
11:00 AM
Dkt. 35 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

KEEP THE NORTH SHORE COUNTRY,
Appellant-Appellant,

vs.

BOARD OF LAND AND NATURAL RESOURCES; THE DEPARTMENT OF LAND AND
NATURAL RESOURCES; SUZANNE D. CASE, IN HER OFFICIAL CAPACITY AS
CHAIRPERSON OF THE BOARD OF LAND AND NATURAL RESOURCES;
and NA PUA MAKANI POWER PARTNERS, LLC,
Appellees-Appellees.

SCAP-19-0000449

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-19-0000449; CIV. NO. 1CC181000960)

FEBRUARY 22, 2022

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND WILSON, JJ.,
AND CIRCUIT JUDGE VIOLA, ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY NAKAYAMA, J.

This appeal arises from a challenge to the Na Pua

Makani Wind Farm (the Wind Farm), an eight-turbine wind power

plant proposed for the North Shore of Oʻahu.  To operate the Wind Farm, Appellee-appellee Na Pua Makani Power Partners, LLC (Applicant) must obtain an incidental take license as part of a habitat conservation plan approved by Appellee-appellee Board of Land and Natural Resources (the Board or BLNR).

After years of study and collaboration with state and federal agencies, Applicant submitted a proposed habitat conservation plan and requested the Board's approval.  However, Appellant-appellant Keep the North Shore Country (KNSC) opposed the application, citing the Wind Farm's potential impact on ʻōpeʻapeʻa, the Hawaiian hoary bat.  Following significant state and federal agency review, numerous public meetings, and a contested case hearing, the Board approved Applicant's habitat conservation plan, and authorized Applicant to take up to fifty-one ʻōpeʻapeʻa over the course of twenty-one years, or fewer than two and a half bats per year.

On appeal to the circuit court, KNSC argued the Board unlawfully approved the habitat conservation plan because of alleged procedural irregularities and because the habitat conservation plan does not comply with Hawaiʻi's endangered species statute, Hawaiʻi Revised Statutes (HRS) chapter 195D. For the reasons explained below, KNSC's arguments are unavailing.  We accordingly affirm the Circuit Court of the First Circuit's (circuit court) May 23, 2019 Final Judgment.

## I.    Background

### A.    Introduction

#### 1.    Habitat Conservation Plans and Incidental Take Licenses

The Legislature enacted the Hawai'i endangered species statute, HRS chapter 195D, "[t]o insure the continued perpetuation of indigenous aquatic life, wildlife, and land plants[.]"  HRS § 195D-1 (2011).  To effectuate this goal, the Legislature made it unlawful to take[1] any threatened[2] or endangered[3] species.  HRS § 195D-4(e)(2).[4]  Nevertheless, the

---

[1]    As relevant here, "'[t]ake' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect endangered or threatened species of . . . wildlife . . . or to attempt to engage in any such conduct."  HRS § 195D-2 (2011).

[2]    Under Hawai'i law, a species is "threatened" if it "appears likely, within the foreseeable future, to become endangered and has been so designated."  HRS §§ 195D-2, 195D-4(a) (2011); see also 16 U.S.C. § 1532(20) (2012).  The determination of whether a species is threatened may be made by either the Department of Land and Natural Resources (the Department or DLNR) or the United States Secretary of the Interior or Secretary of Commerce.  HRS §§ 195D-2, 195D-4(a)-(b); 16 U.S.C. §§ 1532(15), 1533 (2012).

[3]    Under Hawai'i law and as relevant here, a species is "endangered" if its "continued existence as a viable component of Hawaii's indigenous fauna or flora is determined to be in jeopardy and has been so designated pursuant to section 195D-4."  HRS §§ 195D-2, 195D-4(a); see also 16 U.S.C. § 1532(6).  As with the threatened species designation, the determination of whether a species is endangered may be made by either the Department or the United States Secretary of the Interior or Secretary of Commerce.  HRS §§ 195D-2, 195D-4(a)-(b); 16 U.S.C. §§ 1532(6), 1533.

[4]    HRS § 195D-4 (2011) provides in relevant part:

> (e)    With respect to any threatened or endangered species of aquatic life, wildlife, or land plant, it is unlawful, except as provided in subsections (f), (g), and (j), for any person to:
>
> . . .
>
> (2)    Take any such species within this State[.]

. . . .

(f)     The department may issue temporary licenses, under such terms and conditions as it may prescribe, to allow any act otherwise prohibited by subsection (e), for scientific purposes or to enhance the propagation or survival of the affected species.

(g)     After consultation with the endangered species recovery committee, the board may issue a temporary license as a part of a habitat conservation plan to allow a take otherwise prohibited by subsection (e) if the take is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity; provided that:

(1)     The applicant, to the maximum extent practicable, shall minimize and mitigate the impacts of the take;

(2)     The applicant shall guarantee that adequate funding for the plan will be provided;

(3)     The applicant shall post a bond, provide an irrevocable letter of credit, insurance, or surety bond, or provide other similar financial tools, including depositing a sum of money in the endangered species trust fund created by section 195D-31, or provide other means approved by the board, adequate to ensure monitoring of the species by the State and to ensure that the applicant takes all actions necessary to minimize and mitigate the impacts of the take;

(4)     The plan shall increase the likelihood that the species will survive and recover;

(5)     The plan takes into consideration the full range of the species on the island so that cumulative impacts associated with the take can be adequately assessed;

(6)     The measures, if any, required under section 195D-21(b) shall be met, and the department has received any other assurances that may be required so that the plan may be implemented;

(7)     The activity, which is permitted and facilitated by issuing the license to take a species, does not involve the use of submerged lands, mining, or blasting;

(8)     The cumulative impact of the activity, which is permitted and facilitated by the license, provides net environmental benefits; and

(9)     The take is not likely to cause the loss of genetic representation of the affected population of any endangered, threatened, proposed, or candidate plant species.

Board approval shall require an affirmative vote of not less than two-thirds of the authorized membership of the board after holding a public hearing on the matter on the affected island.  The department shall notify the public of

Legislature recognized some degree of take is unavoidable — even necessary — and therefore authorized the Board[5] to issue "incidental take licenses" when certain conditions are met. See HRS § 195D-4(g).

In order to issue an incidental take license, the Board must issue the license as part of a habitat conservation plan. Id. Broadly speaking, a habitat conservation plan is an agreement to "protect[], maintain[], restor[e], or enhance[e] identified ecosystems, natural communities, or habitat types" protected species depend upon, as well as to "increase the likelihood of recovery of the endangered or threatened species that are the focus of the plan." HRS § 195D-21(b)(1).[6] "All

---

a proposed license under this section through publication in the periodic bulletin of the office of environmental quality control and make the application and proposed license available for public review and comment for not less than sixty days prior to approval.

[5] The Board is the executive board that heads the Department. HRS § 171-3(a) (2011). The Board is comprised of seven members appointed by the governor subject to the senate's advice and consent. HRS § 171-4(a) (Supp. 2014). At least one member of the Board must possess a background in conservation and natural resources, and at least one other member of the Board must have a demonstrated expertise in native Hawaiian traditional and customary practices. HRS § 171-4(b)-(c).

[6] HRS § 195D-21(b) (2011) provides in relevant part:

(1) Except as otherwise provided by law, the board, upon recommendation from the department, in cooperation with other state, federal, county, or private organizations and landowners, after a public hearing on the island affected, and upon an affirmative vote of not less than two-thirds of its authorized membership, may enter into a habitat conservation plan, if it determines that:

(A) The plan will further the purposes of this chapter by protecting, maintaining, restoring,

habitat conservation plans, . . . incidental take licenses, and

subsequent actions authorized under those plans . . . and

licenses shall be designed to result in an overall net gain in

the recovery of Hawaii's threatened and endangered species."

HRS § 195D-30 (2011).

---

or enhancing identified ecosystems, natural
communities, or habitat types upon which
endangered, threatened, proposed, or candidate
species depend within the area covered by the
plan;
(B)    The plan will increase the likelihood of
recovery of the endangered or threatened
species that are the focus of the plan; and
(C)    The plan satisfies all the requirements of this
chapter.

In the event the board votes to enter into a habitat
conservation plan for which the majority of the
endangered species recovery committee recommended
disapproval, the board may not enter into the habitat
conservation plan unless the plan is approved by a
two-thirds majority vote of both houses of the
legislature.  Habitat conservation plans may allow
conservation rental agreements, habitat banking, and
direct payments.  Any habitat conservation plan
approved pursuant to this section shall be based on
the best available scientific and other reliable data
available at the time the plan is approved.

(2)    Each habitat conservation plan shall:

. . .

(C)    Identify the steps that will be taken to
minimize and mitigate all negative impacts,
including without limitation the impact of any
authorized incidental take, with consideration
of the full range of the species on the island
so that cumulative impacts associated with the
take can be adequately assessed; and the
funding that will be available to implement
those steps[.]

Before the Board may approve a habitat conservation plan, applicants and the Board must undergo a complex administrative process.

First, the applicant must draft the habitat conservation plan, identifying the area(s) affected, the species involved, the action(s) to be taken, an implementation schedule, and a funding source.  HRS § 195D-21(a).[7]  The plan must provide

---

[7]     HRS § 195D-21(a) provides:

> (a) The department may enter into a planning process with any landowner for the purpose of preparing and implementing a habitat conservation plan.  An agreement may include multiple landowners.  Applications to enter into a planning process shall identify:
>
> (1)  The geographic area encompassed by the plan;
> (2)  The ecosystems, natural communities, or habitat types within the plan area that are the focus of the plan;
> (3)  The endangered, threatened, proposed, and candidate species known or reasonably expected to occur in the ecosystems, natural communities, or habitat types in the plan area;
> (4)  The measures or actions to be undertaken to protect, maintain, restore, or enhance those ecosystems, natural communities, or habitat types within the plan area;
> (5)  A schedule for implementation of the proposed measures and actions; and
> (6)  An adequate funding source to ensure that the proposed measures and actions are undertaken in accordance with the schedule.
>
> After a habitat conservation plan is prepared, the board shall notify the public of the proposed habitat conservation plan through the periodic bulletin of the office of environmental quality control and make the proposed plan and the application available for public review and comment not less than sixty days prior to approval.  The notice shall include, but not be limited to, identification of the area encompassed by the plan, the proposed activity, and the ecosystems, natural communities and habitat types within the plan area.  The notice shall solicit public input and relevant data.

"sufficient information for the board to ascertain with reasonable certainty the likely effect of the plan upon any endangered, threatened, proposed or candidate species in the plan area and throughout its habitat range." HRS § 195D-21(c) (2011).

Second, the Board must notify the public and make the proposed plan available for public review and comment for at least 60 days. HRS § 195D-21(a).

In addition to public review, the Endangered Species Recovery Committee (the Committee or ESRC)[8] must also review the proposed plan and make a recommendation for the Board to approve, amend, or reject the plan. HRS § 195D-25(b)(1).[9] The

_____

[8] The Committee "serve[s] as a consultant to the [B]oard and the [D]epartment on matters relating to endangered, threatened, proposed, and candidate species." HRS § 195D-25(a) (Supp. 2014). The Committee consists of up to seven members, specifically:

> two field biologists with expertise in conservation biology, the chairperson of the [B]oard or the chairperson's designee, the ecoregion director of the United States Fish and Wildlife Service or the director's designee, the director of the United States Geological Survey, Biological Resources Division or the director's designee, the director of the University of Hawaii Environmental Center or the director's designee, and a person possessing a background in native Hawaiian traditional and customary practices[.]

Id. The nongovernmental members, i.e., the two field biologists and the person possessing a background in native Hawaiian traditional and customary practices, are appointed by the governor subject to the senate's advice and consent. Id. If either of the two federal governmental members, i.e., the ecoregion director of FWS and the director of the United States Geological Survey, Biological Resources Division, declines to participate, the Committee may act despite their absence. Id.

[9] HRS § 195D-25(b)(1) (2011) provides:

> (b) The endangered species recovery committee shall:

Committee's recommendation must be based on "the best available scientific and other reliable data and at least one site visit to each property that is the subject of the action," as well as a "consideration of the cumulative impacts of the proposed action on the recovery potential of the [relevant] species[.]" Id.

Third, following review by the public and the Committee, the Board may approve a habitat conservation plan and incidental take license if (1) the Committee recommends approval,[10] (2) at least two-thirds of the Board's members vote in favor of approval, and (3) the Board makes three key determinations. HRS § 195D-21(b)(1). These determinations are:

> (A) The plan will further the purposes of [HRS chapter 195D] by protecting, maintaining, restoring, or enhancing identified ecosystems, natural communities, or habitat types upon which endangered, threatened, proposed, or candidate species depend within the area covered by the plan;

---

> (1) Review all applications and proposals for habitat conservation plans, safe harbor agreements, and incidental take licenses and make recommendations, based on a full review of the best available scientific and other reliable data and at least one site visit to each property that is the subject of the proposed action, and in consideration of the cumulative impacts of the proposed action on the recovery potential of the endangered, threatened, proposed, or candidate species, to the department and the board as to whether or not they should be approved, amended, or rejected[.]

[10]    In the event the Committee recommends that the Board reject the proposed habitat conservation plan, the Board may only enter into the plan following approval by a two-thirds majority vote of both houses of the Legislature. HRS § 195D-21(b)(1).

9

> > (B) The plan will increase the likelihood of the recovery of the endangered or threatened species that are the focus of the plan; and
> > (C) The plan satisfies all the requirements of this chapter.

Id. The BLNR must make these determinations using "the best available scientific and other reliable data available at the time the plan is approved." HRS § 195D-21(c).

Furthermore, an applicant may receive an incidental take license only if ten statutory conditions are met. First, the take must be "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." HRS § 195D-4(g). Additionally,

> > (1) The applicant, to the maximum extent practicable, shall minimize and mitigate the impacts of the take;
> > (2) The applicant shall guarantee that adequate funding for the plan will be provided;
> > (3) The applicant shall post a bond, provide an irrevocable letter of credit, insurance, or surety bond, or provide other similar financial tools, including depositing a sum of money in the endangered species trust fund created by section 195D-31, or provide other means approved to the board, adequate to ensure monitoring of the species by the State and to ensure that the applicant takes all actions necessary to minimize and mitigate the impacts of the take;
> > (4) The plan shall increase the likelihood that the species will survive and recover;
> > (5) The plan takes into consideration the full range of the species on the island so that cumulative impacts associated with the take can be adequately assessed;
> > (6) The measures, if any, required under section 195D-21(b) shall be met, and the department has received any other assurances that may be required so that the plan may be implemented;
> > (7) The activity, which is permitted and facilitated by the license, does not involve the use of submerged lands, mining, or blasting;
> > (8) The cumulative impact of the activity, which is permitted and facilitated by the license, provides net environmental benefits; and
> > (9) The take is not likely to cause the loss of genetic representation of an affected population of any

endangered, threatened, proposed, or candidate plant species.

Id.

**2.  Na Pua Makani Wind Farm**

Around 2009, West Wind Works, LLC began developing plans for the Wind Farm.  The Wind Farm would be the third wind turbine power plant on Oʻahu, joining the Kawailoa Wind Farm and the Kahuku Wind Farm.  Champlin Hawaii Wind Holdings, LLC acquired these plans in 2012, and formed Na Pua Makani Power Partners, LLC to complete the development and construction of the Wind Farm.  Beginning in January 2013, Applicant began consulting with the United States Fish and Wildlife Service (FWS) as well as the Department's Division of Forestry and Wildlife (DOFAW) to develop a proposed habitat conservation plan and incidental take license.

On February 17, 2015, Applicant submitted a proposed habitat conservation plan and incidental take license (Proposed Plan) to the Department for publication in the Office of Environmental Quality Control's March 8, 2015 Environmental Notice.  In the Proposed Plan, Applicant proposed building eight to ten wind turbines with a maximum height of 156 meters each. According to Applicant's site evaluations and consultations with

FWS and DOFAW, the Wind Farm could take eight federally protected species, including ʻōpeʻapeʻa.[11]

Applicant proposed minimizing the take of ʻōpeʻapeʻa by utilizing a low-wind speed curtailment (LWSC)[12] rate of 5.0 meters per second (m/s). Additionally, Applicant would minimize and mitigate the impacts of the take by funding efforts to restore the nearby Poamoho Ridge forest to a native state, as well as by funding research on ʻōpeʻapeʻa to develop additional mitigation efforts. Taking these measures into consideration, Applicant, FWS, and DOFAW anticipated the Wind Farm would take up to fifty-one ʻōpeʻapeʻa over the course of twenty-one years, or fewer than two and a half ʻōpeʻapeʻa per year.

B. **Procedural History**

1. **Endangered Species Recovery Committee Proceedings**

In the course of reviewing the Proposed Plan, the Committee held four public meetings. First, on March 30, 2015, the Committee conducted a site visit meeting. Prior to and

---

[11] The Wind Farm may also impact the ʻaʻo or Newell's shearwater, the aeʻo or Hawaiian black-necked stilt, the ʻalae keʻokeʻo or Hawaiian coot, the ʻalaeʻula or Hawaiian common moorhen, the koloa maoli or Hawaiian duck, the nēnē or Hawaiian goose, and the pueo or Hawaiian short-eared owl. Because KNSC solely challenges the Wind Farm's impact on ʻōpeʻapeʻa, this opinion does not discuss Applicant's plans in relation to these other protected species.

[12] LWSC is a process that sets the minimum wind speed at which a wind turbine starts generating energy. While LWSC is in effect, i.e., while the turbine is curtailed, the turbine's blades are turned parallel to the wind direction to minimize the spinning of the wind turbines. Thus, with a LWSC rate of 5.0 m/s, the wind turbine blades are positioned to be mostly stationary while wind speeds are below 5.0 m/s, and turned to "catch" the wind, spin, and generate energy once wind speeds exceed 5.0 m/s.

during the site visit, the Committee and Applicant answered questions regarding the Wind Farm.  Second, on March 31, 2015, the Committee received public comment on the proposed habitat conservation plan.  During both meetings, Applicant indicated the maximum height for the wind turbines would be 156 meters, and not all turbines would be the same height.

Between March 31, 2015 and December 17, 2015, Applicant worked with DOFAW and FWS to address concerns raised by public commenters, FWS, DOFAW, and the Committee.  Applicant increased the maximum wind turbine height from 156 meters to 200 meters.  This change, among others, was made known to the public as part of the materials prepared for the Committee's December 17, 2015 meeting.

During this time, the state senate also confirmed Dr. Samuel M. 'Ohukani'ohi'a Gon III (Gon) to the Committee as a member with a background in native Hawaiian traditional and customary practices.  2015 Senate Journal, at 478 (Apr. 10, 2015); see also Letter from David Y. Ige, Governor, State of Hawai'i, to Donna M. Kim, President, Hawai'i State Senate (Mar. 30, 2015).

On December 17, 2015, the Committee held a third public meeting.  At the beginning of the Committee's discussion of the Wind Farm, DOFAW staff highlighted changes to the Proposed Plan, including the proposed maximum wind turbine

height increase.  The Committee asked Applicant to make additional amendments to the Proposed Plan, but did not comment on Applicant's proposed maximum wind turbine height increase or its potential impact on take.  No member of the public commented on the increased turbine height either.  The Committee unanimously decided to postpone its recommendation.

In January 2016, Applicant produced an amended habitat conservation plan (Finalized Plan) that incorporated the Committee's requested amendments.

On February 25, 2016, the Committee reviewed the Finalized Plan.  Gon moved to recommend that the Board approve the Finalized Plan, which was unanimously approved by all voting Committee members.[13]

## 2.  Contested Case Hearing Officer Proceedings

The Board took up the Finalized Plan on November 10, 2016.  As the Board began its consideration, Gon[14] disclosed

> he was briefly on the endangered species advisory committee
> that advises windfarm projects.  He is no longer on that

---

[13]    One Committee member, Dr. Eric VanderWerf, recused himself.

[14]    On August 9, 2016, Governor Ige appointed Gon to fill a vacancy on the Board.  Governor Appoints Samuel Gon III to Board of Land and Natural Resources, Ofc. of the Governor Press Releases (Aug. 9, 2016), https://governor.hawaii.gov/newsroom/governors-office-news-release-governor-appoints-samuel-gon-iii-to-board-of-land-and-natural-resources/.  The member Gon replaced, Ulalia Woodside, was nominated to satisfy the statutory requirement for one Board member to possess demonstrated expertise in native Hawaiian traditional and customary practices.  Governor Appoints 3 Members to Board of Land and Natural Resources, Ofc. of the Governor News Releases (July 12, 2014), https://dlnr.hawaii.gov/blog/2014/07/12/gov-appoints-3-members-blnr/; see also HRS § 171-4(c).

> committee and this particular company and proposal was not one that he provided substantial input to.

Following Gon's disclosure, no party objected to Gon participating in the Board's consideration of the Finalized Plan.

The Board heard testimony from Applicant and members of the public.  Several members of the public, including KNSC, requested a contested case hearing.  The Board unanimously deferred deciding whether to grant a contested case hearing, as well as its consideration of the Finalized Plan, until its next meeting.  KNSC submitted a written petition for a contested case hearing on November 21, 2016.

At its December 9, 2016 meeting, the Board addressed KNSC's contested case hearing petition.  Board Chair Suzanne Case and Board members Gon and James Gomes disputed the need for a contested case hearing.  Gon explained, with James Gomes agreeing, that

> when a habitat conservation plan is put together it has to pass the Fish and Wildlife Service and the DLNR.  The suggestion that the habitat conservation plan is fatally flawed or inadequate[ly] researched [is] problematic in his mind.

No comments objecting to Gon's statement appear in the record. The Board granted KNSC's petition in a four to three vote.

The contested case hearing proceedings began on approximately February 14, 2017, with the appointment of Yvonne Y. Izu as the hearing officer.  During the contested case

15

hearing, the parties addressed whether the Finalized Plan satisfied the requirements of HRS chapter 195D. Following briefing and a two-day evidentiary hearing, the hearing officer recommended the Board disapprove of the Finalized Plan.

As relevant here, the hearing officer concluded:

> 1.e. ʻOpeʻapeʻa. By providing for LWSC at 5 m/s, instead of 6.5 m/s, the [Finalized Plan] fails to minimize impacts to ʻopeʻapeʻa to the maximum extent practicable, and, therefore, may not be protecting or maintaining the habitat used by ʻopeʻapeʻa (i.e., the Project area) as required under HRS § 195D-21(b)(1)(A). FOF 197-210. Because of limited knowledge about ʻopeʻapeʻa, it cannot be concluded that the proposed mitigation of improvement of habitat at Poamoho Ridge will protect, maintain, restore, or enhance the ecosystems, natural communities, or habitat types upon which ʻopeʻapeʻa depend. FOF 216. As the [Finalized Plan] does not include an effective adaptive management strategy for revising mitigation measures if future research reveals that different mitigation measures would be more effective in protecting and maintaining habitat used by ʻopeʻapeʻa, FOF 228-238, the [Finalized Plan] does not [satisfy HRS § 195D-21(b)(1)(A)-(B)] with respect to ʻopeʻapeʻa.
>
> . . . .
>
> 5.e. ʻOpeʻapeʻa. . . . . Because very little is known about the population status of ʻopeʻapeʻa (estimates range from a few hundred to a few thousand), and given the fact that take of ʻopeʻapeʻa by wind energy facilities may have been underestimated in the past, a robust analysis of potential take is critical. By relying solely on the Kahuku Wind Project as a surrogate and electing not to consider data from other wind facilities on Oahu or the other islands, and by failing to consider the impact of turbine height on bat mortality, the estimated take set forth in the [Finalized Plan] is not reliable enough for the Board to determine the cumulative impacts on ʻopeʻapeʻa. FOF 194.
>
> . . . .
>
> 11. In three instances, Applicant failed to use the best scientific and reliable data in assessing impacts and mitigation as required under HRS § 195D-21(c): (i) electing to use LWSC cut-in speed of 5 m/s, instead of 6.5 m/s; (ii) concluding that the height of [wind turbine generators] has no impact on take of ʻopeʻapeʻa; and (iii) by relying solely on data from the Kahuku Wind Project for estimating the Project's take of ʻopeʻapeʻa.

12. Because of the less than robust analysis of anticipated take of 'ope'ape'a by the Project, combined with the limited information available about 'ope'ape'a populations on Oahu and statewide, it cannot be determined with confidence whether the Project will jeopardize the continued existence of 'ope'ape'a. HRS § 195D-21(c)(1). FOF 194.

. . . .

14. The [Finalized Plan], by (i) relying solely on data from the Kahuku Wind Project [and] excluding data from other wind projects in the State, and (ii) failing to analyze the impact of the increased height of [wind turbine generators] on 'ope'ape'a, failed to provide sufficient information for the Board to ascertain with reasonable certainty the effect of the plan on 'ope'ape'a in the plan area and throughout its habitat range. HRS § 195D-21(c). FOF 194.

. . . .

18. [HRS § 195D-4(g)(1)] requires the applicant to minimize and mitigate impacts of the take to the maximum extent practicable. Increasing cut-in speed to 6.5 m/s, rather than 5 m/s, would minimize impacts to the maximum extent. However, the HCP provides for cut-in speed at 5 m/s and Applicant did not provide evidence that increasing cut-in speed to 6.5 m/s is not practicable. Therefore, the [Finalized Plan] does not satisfy HRS § 195D-4(g)(1). FOF 208-210.

. . . .

21. The minimization and mitigation measures proposed in the [Finalized Plan] are aimed at increasing the likelihood of survival and recovery of all of the Covered Species except 'ope'ape'a. HRS § 195D-4(g)(4). See COL 5.a. through 5.e., above. Additionally, not enough information is known about the potential acquisition of property for protection of 'ope'ape'a habitat for the Board to analyze whether it would mitigate the impacts of take. FOF 226.

22. Because Applicant conducted a less than robust analysis of anticipated take of 'ope'ape'a, especially given the higher than anticipated rate of take experienced at other wind energy projects in the state, the Board is unable to adequately assess the cumulative impact of the take of 'ope'ape'a as required by HRS § 195D-4(g)(5). FOF 194.

. . . .

17

27.  The required public hearing was held on the [Proposed Plan] on June 4, 2015.  Additionally, the public had the opportunity to attend [Committee] meetings during which the [Proposed Plan] was discussed.  Although the height of the [wind turbine generators] was changed subsequent to the June 4, 2015 public hearing, and there was no active discussion about the change in [wind turbine generator] height at the [Committee] meetings, [HRS § 195D-4(g)] does not require that additional public hearings be held after changes are made to the [Proposed Plan].  FOF 8-10.

3.    **Board of Land and Natural Resources Hearing Proceedings**

After the hearing officer issued her recommended findings of fact, conclusions of law, and decision and order, Applicant and KNSC submitted further briefing in the form of exceptions to the hearing officer's recommendations.

On January 12, 2018, the Board heard arguments from both the Applicant and KNSC.

Before the parties made their arguments, Board Chair Suzanne Case disclosed that the Board

received a letter from Senator Lorraine Inouye to be distributed to the board in this matter.  We did not -- we actually did distribute it accidentally, because I was out sick and our regular board person was out sick, and our protocol is to check with me first, and so we didn't have that in place.  So it went out, but I immediately saw that it had gone out and I followed up in an immediate email to ask the board members not to read the letter.  So none of us have read that letter, because we didn't want to have any ex parte communications in that, but I wanted to make that disclosure that that happened.

KNSC did not raise any objections regarding the letter during the hearing.[15]  KNSC also did not seek the recusal of any Board members based upon the letter.

---

[15]    KNSC later requested a copy of the letter on January 24, 2018.

During the hearing, Applicant argued the hearing officer's conclusions were flawed because

> There was virtually no analysis or evaluation in the recommendations provided by the hearing officer about why the agencies or the specific experts for the agencies were wrong in their recommendation for approval. There was no finding of fact or conclusion of law that explains how [or] why [DOFAW] or the ESRC failed to properly analyze the statute or not use the best available science.

Applicant added KNSC did not provide any additional studies or data that contravened the agencies' conclusions. Nevertheless, Applicant volunteered two conditions to the Board's approval of the Finalized Plan to address the "inherent uncertainty" of the studies and science the agencies relied upon regarding the impact of wind turbine height on ʻōpeʻapeʻa take. First, Applicant would limit the maximum turbine height to 173 meters. Second, Applicant would further reduce the total number of turbines from nine to eight.

KNSC responded that the hearing officer was correct to recommend that the Board disapprove of the Finalized Plan because (1) Applicant relied solely on data from the Kahuku Wind Farm, (2) Applicant did not study the impacts of wind turbine height on ʻōpeʻapeʻa take, and (3) there is no evidence in the record that a LWSC rate of 6.5 m/s is impracticable.

4.  **KNSC's Motion to Recuse Gon**

During the hearing, KNSC orally requested that Gon recuse himself "due to prior decision making in his capacity on

the Endangered Species Recovery Committee on this exact Habitat

Conservation Plan."

After the parties made their arguments, Gon spoke on

KNSC's recusal request.

> I don't have a question, but I should point out in response to the request for -- for my recusal. This was -- we discussed this with the attorney general's office and also with the ethics -- ethics commission and the opinion is that -- is that my serving on the Endangered Species Recovery Committee is via my expertise as a conservation biologist. I have in fact published on Hawaiian bats.

> . . . .

> So, you know, the -- the idea of turning this [Finalized Plan] back [to] the ESRC at this stage, mere months after its issuance and approval, is not going to result in any -- in any significant change in the information that has already been considered by the ESRC and by the state and federal agencies. And yet I'm very interested in hearing and in fact have looked over the -- this contested case record.

> The idea of my ability to take in fresh information and provide for an opinion on this particular case is not in question. I enjoy looking at new information, considering whether or not it provides a significant deviation from what has already been known at the time. I'm actually in a really good position to determine whether or not what I hear today, what I've read in the contested case information does represent relatively new information. So the decision was made in consultation with the [attorney general] for me to remain in this deliberation.

> And then continuing on now, the idea that the ESRC did not consider other turbine projects and other bats and the ramifications of that on this particular case is probably erroneous. I mean, the fact that it doesn't show up in the [Finalized Plan] record kind of flies in the face of the fact that the ESRC went to visit as many of these projects in person to look at the areas that were being surveyed, to consider the records for each of those places, the different conditions and habitat, the -- everything from the vegetation, to the wind, typical wind, behavior, and the like in order to assess what was most appropriate to apply to this particular [habitat conservation plan].

> So I just wanted to point out that the decision by the ESRC to follow the guidance of the state and federal representatives there to utilize the Kahuku -- the adjacent Kahuku information was not lightly made, nor was it meant

> to try to fudge the data or in other ways influence or
> minimize the potential impact of this.  In fact they
> considered, with a great deal of concern, the fact that the
> take of 'ope'ape'a were higher than anticipated in almost all
> of the sites, actually.  So that's another consideration to
> take as we consider -- continue in this deliberation.

On January 24, 2018, KNSC submitted written briefing to elaborate on its request for Gon's recusal.  KNSC specified that Gon's "participation would have provided him very specific information about this habitat conservation plan that is not in the record."  As evidence of Gon's alleged extra-record considerations, KNSC pointed to Gon's statement during the Board hearing that

> The fact that it does not show up in the [Finalized Plan]
> record, kind of flies in the face of the fact that the ESRC
> went to visit as many of these projects in person to look
> at the areas that were being surveyed, to consider the
> records for each of those places, the different conditions
> and habitat, everything from the vegetation, to typical
> wind behavior and the like, in order to assess what was
> most appropriate to apply to this particular [Finalized
> Plan].

KNSC also argued Gon's vote for the Board to approve of the Finalized Plan meant that he prejudged the issues before the Board.

Gon submitted a supplemental written disclosure on February 21, 2018.  Gon noted, inter alia, that "I was invited to serve on the ESRC of the DLNR, where, with other experts and agency managers of endangered species, we considered the impacts and mitigation recommendations for various projects of relevance to the DLNR.  While on the ESRC, I considered the [habitat conservation plan] at issue currently."

21

On March 23, 2018, the Board denied KNSC's request for Gon's recusal. The Board observed that "[n]othing in the record shows that Member Gon has not complied or will not comply with HRS §§ 91-9(g) and 91-13." The Board also reasoned that the fact that HRS § 195D-25 authorizes the Board chair to also serve on the Committee means there is no inherent conflict from Gon sitting on both the Committee and the Board. The Board noted that this court's decision in Liberty Dialysis-Hawaii, LLC v. Rainbow Dialysis, LLC, 130 Hawaiʻi 95, 306 P.3d 140 (2013) supports its conclusion because, there, this court held that an administrator could participate in both an initial decision and a subsequent reconsideration. Additionally, the Board stated that "KNSC has not shown that Member Gon's participation on the ESRC during the ESRC's review and deliberation on the habitat conservation plan prejudices his views in this contested case."

## C. Board Decision

On May 18, 2018, the Board entered its findings of fact, conclusions of law, and decision and order approving Applicant's Finalized Plan. The Board summarized its decision to follow the Committee's recommendation and disagree with the hearing officer in four points:

> a. The hearing officer did not give sufficient weight to the scientific expertise of the ESRC and DOFAW, which recommended approval of the [Finalized Plan].

22

    b. The [Finalized Plan] properly relied upon the
    actual experience of the adjacent Kahuku wind farm in
    estimating the probable take of 'ōpe'ape'a.

    c. The [Finalized Plan] requires that the wind farm
    idle its turbines at speeds less than 5.0 meters per second
    ("m/s"), during the months that bats are found more often.
    The hearing officer supported a 6.5 m/s requirement.
    Current science does not establish that this will
    significantly reduce bat fatalities, and it is not what the
    ESRC recommends.  The Board's decision would require that
    turbines be idled at wind speeds higher than 5.0 m/s under
    certain circumstances.

    d. The hearing officer was skeptical that part of the
    proposed mitigation for the take of bats—the protection of
    existing 'ōpe'ape'a habitat in a native forest—would be
    effective.  This type of mitigation is supported by the
    consensus of scientific opinion, including the ESRC, DOFAW,
    and the U.S. Fish and Wildlife Service's Endangered Species
    Recovery Plan.

Furthermore, the Board imposed two relevant conditions: "[b]ased

on the representations of the Applicant, [(1)] the Project shall

include not more than eight wind turbines, [(2)] with a maximum

blade tip height of not more than 173 meters above pad

elevation."

    The Board elaborated

    The [Finalized Plan] was developed through consultation not
    only with the ESRC, but also with DOFAW and [FWS], species
    experts, other important stakeholders, and the public.
    Input and incorporation of requirements and revisions from
    the ESRC occurred throughout the development process and
    public review periods of the [Finalized Plan].

The Board emphasized that, rather than "rubber-stamp[ing]" the

Finalized Plan, the Committee actually requested amendments

during its December 17, 2015 meeting.  Furthermore, the

Committee based its decision on the Hawaiian Hoary Bat Guidance

Document, which was analyzed during a two-day workshop "attended

by government regulators, ecological researchers, consultants, industry personnel, and members of the public."

With respect to Applicant and the Committee's focus on the Kahuku Wind Farm data, the Board reasoned there was "ample justification" for the Finalized Plan's reliance on the Kahuku Wind Farm data and rejection of the Kawailoa Wind Farm data. The Board explained

> The choice to use only Kahuku data, not Kawailoa, was proper because:
>
>> a. Kahuku is immediately adjacent to [the Wind Farm].
>>
>> b. Kahuku is also on the windward side of the Koʻolau Mountains; Kawailoa is more than four miles away on the leeward side.
>>
>> c. Kahuku has similar topography and vegetation.
>> . . . .
>>
>> d. Kahuku has similar levels of bat activity to the [Wind Farm] site.
>>
>> e. Kawailoa has a much higher level of bat activity than Kahuku, and hence higher projected take, than the [Wind Farm] site.
>>
>> f. If Kawailoa data was included, there would have to be some weighting of the Kawailoa data vs. the Kahuku data. Any weighting—50/50? 20/80?—would be arbitrary.

The Board also rejected KNSC's claims that the Kawailoa Wind Farm data should be considered because it has larger turbines that are closer in blade tip height and rotor sweep[16] to the Wind Farm's. In particular, the Board pointed out

---

[16]    A wind turbine's "rotor sweep" is a function of its blade length. This relationship is dictated by the mathematical relationship between the blade length (which creates the radius of a circle) and the rotor sweep area (the area of the circle formed by the blade's rotation).

that record evidence indicated neither turbine blade tip height nor turbine rotor sweep is correlated with 'ōpe'ape'a take. Moreover, even assuming that either factor correlated with 'ōpe'ape'a take, the Board noted the Finalized Plan actually overestimated its potential take by (1) increasing possible take by 50%; (2) using a heightened unobserved take estimate; (3) basing its calculations on nine turbines when only eight would be approved; and (4) not including Kahuku Wind Farm data showing no observed take in fiscal year 2016.

In terms of KNSC's challenge to the LWSC rate, the Board explained the record evidence was inconclusive on whether increasing the LWSC rate from 5.0 to 6.5 m/s would minimize 'ōpe'ape'a take. The Board noted studies showed 'ōpe'ape'a typically are not present when average wind speeds exceed 5.0 m/s, and that 80% of 'ōpe'ape'a observations occur at wind speeds below 5.0 m/s.

As for Applicant's proposed means of mitigation, the Board concluded Applicant's measures "provid[e] an improved natural habitat for bats which presumably would provide additional food resources, thereby improving ōpe'ape'a survival and productivity and contributing to an increased likelihood of the survivability of the species." The Board noted, in particular, that the FWS determined "the decline of the ōpe'ape'a is probably a result of habitat loss." The Board also found

that the "main" threats to 'ōpe'ape'a included "reduction in tree cover, loss of roosting habitat, [and] roost disturbance." The nearby Poamoho Ridge forest "currently provides habitat for the 'ōpe'ape'a," but it is "declining because of feral pigs, which destroy vegetation, and invasive weeds." As part of its mitigation measures, Applicant proposed "fund[ing] fence maintenance, feral pig removal, invasive weed control, monitoring, and research." Thus, the Board determined "[t]he proposed mitigation should more than offset the take of 'ōpe'ape'a." The Board further stated the measures "overcompensate[]" because they compensate for the take of fifty-one 'ōpe'ape'a, when it is likely that fewer than thirty-four bats will be taken.

D.    **Circuit Court Proceedings**

On June 15, 2018, KNSC appealed the Board's decision to approve the Finalized Plan to the Circuit Court of the First Circuit (circuit court).[17] KNSC asked the circuit court to reverse the Board's decision on six grounds:

(1) Applicant failed to minimize 'ōpe'ape'a take to the maximum extent practicable, contrary to HRS §§ 195D-4(g)(1) and 195D-21(b)(2)(C);

---

[17]    The Honorable Jeffrey P. Crabtree presided.

(2) Applicant failed to provide evidence that 'ōpe'ape'a will survive and recover as a species, contrary to HRS §§ 195D-4(g)(4), 195D-21(b)(1)(B), and 195D-30;

(3) Applicant failed to adequately assess the cumulative impacts of the take on the O'ahu 'ōpe'ape'a population, contrary to HRS §§ 195D-4(g)(5) and 195D-21(b)(2)(C);

(4) the Committee did not base its recommendation on the best scientific and other reliable data available, contrary to HRS § 195D-25(b)(1);

(5) the Board should have excluded Gon from participating in the contested case hearing because Gon considered extra-record evidence and demonstrated bias in favor of the Applicant, contrary to HRS §§ 91-9(g) and 91-13 and KNSC's right to a fair hearing; and

(6) the Board should have provided the letter from state Senator Inouye to KNSC because it constituted an ex parte communication that exerted improper political pressure on the Board, contrary to Hawai'i Administrative Rules (HAR) § 13-1-37[18] and KNSC's right to a fair hearing.

---

[18]     HAR § 13-1-37 (2009) provides in relevant part:

> No party or person petitioning to be a party in a contested case, nor the party's or such person's to a proceeding before the board nor their employees, representatives or agents shall make an unauthorized ex parte communication either oral or written concerning the contested case to the

Following briefing and a hearing, the circuit court summarily rejected each of KNSC's alleged bases for reversal. The circuit court noted that pursuant to HRS § 91-14, the Board's findings of fact and mixed determinations of law and fact are reviewed under the clearly erroneous standard, while the Board's conclusions of law are freely reviewable.

Turning to KNSC's claims, the circuit court pointed out KNSC's first three claims "argue a mixed question of law and fact on whether the BLNR's findings comply with HRS Section 195 regarding the likelihood that ʻōpeʻapeʻa deaths are minimized as a result of the [Finalized Plan], and the likelihood that the ʻōpeʻapeʻa population will increase as a result of the [Finalized Plan]." Thus, the circuit court concluded that KNSC's first three arguments raised "factual issues where the decision-making or analysis could reasonably vary from what the ESRC and BLNR concluded." Considering the record – and the Committee's Hawaiian Hoary Bat Guidance document in particular – the circuit court was "satisfied that those decisions were based on the best available data, and the [take estimates] were reasonably adjusted to account for ambiguity or uncertainty on these factors." Furthermore, the circuit court noted that "if the

_____

presiding officer or any member of the board who will be a participant in the decision-making process.

essential facts relied on in approving the [Finalized Plan] and [incidental take license] turn out to be wrong, the adaptive measures which are part of the [Finalized Plan] should step in and provide further protection for the 'ōpe'ape'a."

As for KNSC's demand for Gon's recusal, the circuit court noted that "a potential problem" arose from Gon's participation in both the Committee and the Board.  However, the circuit court was unable to identify any legal authority precluding Gon's sequential involvement with both bodies.

Lastly, the circuit court deemed KNSC's challenge to state Senator Inouye's letter waived insofar as KNSC did not raise any objection before the Board.

The circuit court entered a final order and its judgment on May 23, 2019.

KNSC timely appealed the circuit court's decision to the Intermediate Court of Appeals, and submitted an application to transfer said appeal to this court.  This court granted KNSC's application for transfer.

## II.  STANDARDS OF REVIEW

### A.  Secondary Appeals

Appellate review of a circuit court decision reviewing an agency decision constitutes a secondary appeal.  Flores v. Bd. of Land and Natural Res., 143 Hawai'i 114, 120, 424 P.3d 469, 475 (2018).  The appellate court must determine whether the

29

circuit court was right or wrong in its decision by applying the standards set forth in HRS § 91-14(g) to the agency's decision. Id. The statute provides:

> Upon review of the record, the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitions may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> > (1) In violation of constitutional or statutory provisions;
> >
> > (2) In excess of the statutory authority or jurisdiction of the agency;
> >
> > (3) Made upon unlawful procedure;
> >
> > (4) Affected by other error of law;
> >
> > (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
> >
> > (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91-14(g) (Supp. 2016). "[U]nder HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6)." Paul's Elec. Serv., Inc. v. Befitel, 104 Hawaiʻi 412, 416, 91 P.3d 494, 498 (2004) (brackets in original) (quoting In re Hawaiian Elec. Co., 81 Hawaiʻi 459, 465, 918 P.2d 561, 567 (1996)).

In a secondary appeal, "[t]his court's review is further qualified by the principle that the agency's decision

30

carries a presumption of validity and appellant has the heavy burden of making a convincing showing that the decision is invalid . . . ." Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan, 87 Hawaiʻi 217, 229, 953 P.2d 1315, 1327 (1998) (citing Bragg v. State Farm Mut. Auto. Ins., 81 Hawaiʻi 302, 304, 916 P.2d 1203, 1205 (1996)).

B.   **Statutory Interpretation**

The interpretation of a statute is a question of law which this court reviews de novo. State v. Ruggiero, 114 Hawaiʻi 227, 231, 160 P.3d 703, 707 (2007).

### III. DISCUSSION

A.   **The circuit court properly applied the clear error standard in reviewing KNSC's challenges based on mixed questions of law and fact.**

On appeal, KNSC asserts the circuit court erred in reviewing KNSC's fact-based arguments under the clear error standard. Specifically, KNSC claims the Board "violated its statutory mandate or exceeded its statutory authority by failing to adhere to parameters required by HRS chapter 195D, committed other errors of law, and issued its decision upon an unlawful procedure" because the Board did not use the "best scientific and other reliable data available." KNSC proceeds to claim that three of the Board's determinations are unsupported by any studies or data: (1) a LWSC rate of 5.0 m/s would minimize and mitigate the impact of ʻōpeʻapeʻa take to the maximum extent

31

practicable, as required by HRS § 195D-4(g)(1); (2) the
Finalized Plan will increase the recovery of ʻōpeʻapeʻa in
compliance with HRS §§ 195D-4(g)(4), 195D-21(b)(1)(B), and 195D-
30; and (3) the Board had sufficient information to assess the
cumulative impacts of take on the Oʻahu ʻōpeʻapeʻa population as
mandated by HRS §§ 194D-4(g)(5) and 195D-21(c).

Whether the Board utilized the best scientific and
other reliable data available constitutes a mixed question of
law and fact.  The circuit court therefore correctly reviewed
the Board's decisions under the clear error standard.

1.   **Courts review agency conclusions on mixed questions of
     law and fact under the clear error standard.**

As a preliminary matter, courts separate their reviews
of agency decisions using three categories: (1) issues of law,
(2) issues of fact, and (3) mixed issues of law and fact.  See
Poe v. Hawaiʻi Labor Rels. Bd., 87 Hawaiʻi 191, 195, 953 P.2d
569, 573 (1998).  Issues of law are reviewed de novo.  Id.
Meanwhile, issues of fact and mixed issues of law and fact are
reviewed for clear error.  Id.  A mixed question of law and fact
exists when the "conclusion is dependent upon the facts and
circumstances of the particular case."  Price v. Zoning Bd. of
Appeals of City and Cnty. of Honolulu, 77 Hawaiʻi 168, 172, 883
P.2d 629, 633 (1994) (citations omitted).

> [A finding of fact] or a mixed determination of law and
> fact is clearly erroneous when (1) the record lacks

32

> substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made.  See Leslie v. Estate of Tavares, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999).  "We have defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion."  Id. (quoting State v. Kotis, 91 Hawai'i 319, 328, 984 P.2d 78, 87 (1999)).

In re Water Use Permit Applications, 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000).

Furthermore, courts generally grant significant weight to an agency's determinations based on technical or scientific facts.  Charles H. Koch, Jr., Administrative Law & Practice 83-88 (3d ed. 2010).  This deference arises from the fact that agencies possess and exercise subject-matter expertise and experience the courts generally lack.  Id. at 75-76.  These qualities place agencies "in a better position than the courts to evaluate 'scientific investigations and research[.]'"  Ko'olau Agric. Co. v. Comm'n on Water Res. Mgmt., 83 Hawai'i 484, 493, 927 P.2d 1367, 1376 (1996).  Courts are therefore hesitant to substitute their judgment for an agency's when the agency uses its expertise and experience to make a mixed determination of law and fact.  Pasco v. Bd. of Trustees of Emps.' Ret. Sys., 142 Hawai'i 373, 379, 420 P.3d 304, 310 (2018); see also In re Water Use Permit Applications, 94 Hawai'i at 154, 9 P.3d at 466; Camara v. Agsalud, 67 Haw. 212, 216, 685 P.2d 794, 797 (1984).

33

Moreover, we have recognized for issues within an agency's expertise "the principle that the agency's decision carries a presumption of validity and [the] appellant has the heavy burden of making a convincing showing that the decision is invalid . . . ." Korean Buddhist Dae Won Sa Temple, 87 Hawaiʻi at 229, 953 P.2d at 1327.

2. **The endangered species statute grants the Board and the Committee the authority to determine what constitutes the best scientific and other reliable data available.**

On appeal and throughout the underlying proceedings, KNSC argues the Board's decision was flawed primarily because the Board did not utilize the best scientific and other reliable data available to make the three challenged conclusions. To support this argument, KNSC implicitly proclaims that one study constitutes the best scientific and other reliable data available on the impact of LWSC rates on ʻōpeʻapeʻa take. KNSC similarly insists that data regarding the Kawailoa Wind Farm's ʻōpeʻapeʻa take forms part of the best scientific and other reliable data available on the relationship between wind turbine height and blade length and the quantity of ʻōpeʻapeʻa take.

Contrary to KNSC's implied argument that either KNSC or the courts can and should identify the best scientific and other reliable data available, the Legislature delegated that responsibility to the Board and the Committee. As previously

mentioned, HRS chapter 195D lays out multiple requirements with which an applicant, a habitat conservation plan, the Committee, and the Board must comply before the Board may approve the habitat conservation plan.  As relevant here, the Committee reviews any proposed habitat conservation plan first, using "the best available scientific and other reliable data and at least one site visit . . . ."  HRS § 195D-25(b)(1).  Once the Committee finishes its review, it may then recommend that the Board either approve, amend, or reject the proposed plan.  Id.

Next, the Board must determine whether the proposed plan, inter alia, "will increase the likelihood of recovery of the endangered or threatened species that are the focus of the plan" and "satisfies all the requirements of [HRS chapter 195D]."  HRS § 195D-21(b)(1).  Pursuant to HRS § 195D-21(c), the Board must make this determination using the "best scientific and other reliable data available at the time its determination is made."  If the "best scientific and other reliable data available at the time [the Board's] determination is made" indicates the habitat conservation plan "fails to meet the criteria of [HRS § 195D-21(a)-(b)]" or "fails to meet the criteria of [HRS § 195D-4(g)]," the Board must disapprove of the plan.  HRS § 195D-21(c).

Considering the Board and the Committee's statutory obligations, the two necessarily must determine what constitutes

35

the best scientific and other reliable data available as part of their decision-making processes.

**3.** **Whether an agency utilizes the best scientific and other reliable data available is a mixed question of law and fact.**

Although KNSC labels the issue of whether the Board utilized the best scientific and other reliable data as a purely legal or procedural error, KNSC does not dispute that the issue presents a mixed question of law and fact. In fact, KNSC tacitly acknowledges this truth by raising factual arguments regarding which studies and data the Board should consider.

In requiring the Board to consider the "best scientific and other reliable data available at the time of its determination," the Legislature established three criteria to be met before the Board must consider a particular piece of information. First, the information must be "available at the time of its determination." In other words, the Board need not consider information that is unavailable when the Board makes its determination. See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv., 807 F.3d 1031, 1047 (9th Cir. 2015) (explaining "the best scientific and commercial data available" standard "does not require the agency to 'conduct new tests or make decisions on data that does not yet exist.'") (quoting San Luis & Delta-Mendota Water Auth. v. Locke, 776 F.3d 971, 996 (9th Cir. 2014)). Moreover, if little research has been done on

36

a subject, the Board need not develop its own research before it may act.  See id.; Sw. Ctr. for Biological Diversity v. Babbitt, 215 F.3d 58, 60 (D.C. Cir. 2000) ("The 'best available data' requirement makes it clear that the Secretary has no obligation to conduct independent studies.").

Second, the information must be "scientific data" or "other reliable data."  This factor allows the Board to consider a range of information from anecdotal evidence to controlled, repeatable studies.  See, e.g., Nw. Ecosystem All. v. U.S. Fish and Wildlife Serv., 475 F.3d 1136, 1147 (9th Cir. 2007) ("Of course a rigorous, large-scale study of Washington gray squirrels' behavior and morphology would be preferable, but in the absence of such a study, credible anecdotal evidence represents the 'best scientific . . . data *available*' and cannot be ignored.") (underscored emphasis added).

Third, the information must be the "best."  This factor requires the Board to evaluate factors such as the applicability and quality of the information.  See Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of Commerce, 635 F.3d 106, 115 (3d Cir. 2011) ("In deciding whether scientific information is the 'best available,' substantial deference is accorded to the Secretary's assessment of the quality of what is available.") (citing Washington Crab Producers, Inc. v. Mosbacher, 924 F.2d 1438, 1448-49 (9th Cir. 1990)) (emphasis

37

added).  The Board may therefore weigh the information before it, identify some information as inapplicable, and exclude that information from its calculations if it does not constitute the best scientific and other reliable data available.  Locke, 776 F.3d at 995 ("An agency complies with the best available science standard so long as it does not ignore available studies, even if it . . . discredits them.") (emphasis added).

The determination of whether a piece of information constitutes the "best scientific and other reliable data available at the time of [the Board's] determination" raises a mixed question of law and fact.  Again, a mixed question of law and fact exists when the "conclusion is dependent upon the facts and circumstances of the particular case."  Price, 77 Hawai'i at 172, 883 P.2d at 633.  The evaluation of whether a piece of information satisfies all three of these criteria is necessarily fact- and circumstance-dependent.  For instance, if a person is asked what the boiling point of water is, the response might be "100 degrees Celsius."  See, e.g., Does water's boiling point change with altitude? Americans aren't sure, Pew Research Ctr., https://www.pewresearch.org/fact-tank/2015/09/14/does-waters-boiling-point-change-with-altitude-americans-arent-sure/ ("It seems like one of those basic science facts: Water boils at 212 degrees Fahrenheit (100 degrees Celsius), right?").  However, this information is neither "reliable data" nor the "best" for a

person who is attempting to boil water at the peak of Mauna Kea, where the reduced air pressure lowers the boiling point of water.  See id. ("The boiling point of water . . . varies according to the surrounding atmospheric pressure.  . . . . But pressure drops as you gain elevation").

Under these circumstances, we note that the Committee and the Board are in the best position to determine what constitutes the best scientific and other reliable data available.  It bears repeating that agencies and their heads, such as the Board, are "in a better position than the courts to evaluate 'scientific investigations and research[.]'"  Koʻolau Agric. Co., 83 Hawaiʻi at 493, 927 P.2d at 1376.  This is because agencies possess subject-matter expertise and experience the courts lack.  Administrative Law & Practice 83-88.

In sum, what constitutes the best scientific and other reliable data available is fact- and circumstance-dependent. The determination of the best scientific and other reliable data available therefore raises a mixed question of law and fact. Price, 77 Hawaiʻi at 172, 883 P.2d at 633.  Thus, the circuit court correctly evaluated KNSC's challenges to the Board's conclusions under the clear error standard.  Poe, 87 Hawaiʻi at 195, 953 P.2d at 573.

B.    **Substantial evidence supports the conclusion that the Board utilized the best scientific and other reliable data available to approve the Finalized Plan.**

We now turn to KNSC's contention that the Board's decision must be vacated because substantial evidence does not support three of the Board's conclusions.  To reiterate briefly, KNSC claims (1) there is no evidence that a 6.5 m/s LWSC rate would not decrease ʻōpeʻapeʻa take more than a 5.0 m/s LWSC rate; (2) there is no evidence that forest restoration efforts will restore Oʻahu's ʻōpeʻapeʻa population; and (3) the Board could not assess the impact of the Wind Farm because it improperly disregarded data.  However, a review of the record shows that Applicant and KNSC presented the Committee and the Board with conflicting information on these matters.  KNSC's concerns therefore appear to arise from the Board's treatment of certain studies and data as opposed to an actual absence thereof.

KNSC's contentions are devoid of merit.  As detailed below, substantial evidence supports the Board's findings.  Substantial evidence consequently also supports the Board's challenged conclusions and this court is not left with the definite and firm conviction that a mistake has been made.

1.  **Substantial evidence supports the Board's conclusion that the Finalized Plan will minimize and mitigate the impacts of the take of ʻōpeʻapeʻa to the maximum extent practicable.**

According to KNSC, "[t]he Board pointed to no evidence that increasing [the LWSC rate] to a cut-in speed of 6.5 m/s would not decrease take of ʻōpeʻapeʻa." Instead, KNSC claims the Board ignored evidence that a 6.5 m/s LWSC rate would reduce ʻōpeʻapeʻa mortality.

Contrary to KNSC's claims, the Board cited two studies for the proposition that a LWSC rate of 6.5 m/s would not result in less take than an LWSC rate of 5.0 m/s. First, the Board pointed to the Bats and Wind Energy Cooperative's 2008 annual report, which "indicated no significant difference in fatalities between these two changes in cut-in speed (5.0 m/s and 6.5 m/s)." Second, the Board found that "[a] study reported in Frontiers in Ecology and the Environment noted . . . there was no difference in bat fatalities between the 5.0 and 6.5 m/s treatments[.]"

Furthermore, the Board actually considered the very data KNSC alleges the Board ignored. Among its findings of fact, the Board acknowledged

> The Fowler Ridge Wind Energy Facility (Indiana) study is the first to demonstrate that bat casualty rates were not only significantly different between control and treatment turbines, but that bat casualty rates were significantly different between cut-in speeds raised to 5.0 m/s (50% reduction in overall bat mortality) versus turbines with

cut-in speeds raised to 6.5 m/s (78% reduction in overall bat mortality).

However, the Board dismissed this study because

> The best data in the record correlating bat activity with wind speed in Hawai'i is the study in the northern Ko'olau area.  According to this study, at Kawailoa, where the researchers obtained extensive data from thermal imaging, "bats were more likely to be present when mean wind speeds were < 4.6 m/s."  The study also says that "bats were more likely to be present when maximum wind speeds were <8.2 m/s."  The difference between the two statements is due to the first referring to mean wind speeds, the second to maximum speeds, i.e. gusts, in ten-minute intervals. According to [the study], about 80% of bat observations occurred when mean wind speeds were < 5 m/s.

(Citations omitted.)

Given the inconsistent nature of the information before the Board, the Board was best positioned to determine which study or studies represented the best scientific and other reliable data available at the time of its determination. Ko'olau Agric. Co. 83 Hawai'i at 493, 927 P.2d at 1376.  The Board's decision to dismiss the study on which KNSC relies therefore "lies within the [Board's] designated expertise and sound discretion."  In re Water Use Permit Applications, 94 Hawai'i at 154, 9 P.3d at 466 (citations omitted).  Rather than present any evidence that the three studies on which the Board relied did not constitute the best scientific and other reliable data, KNSC baldly accuses the Board of disregarding data.[19]  Such conclusory allegations fall short of satisfying KNSC's burden of

---

[19]    In so arguing, KNSC ironically does the very thing of which it accuses the Board — disregard evidence inconsistent with its position.

showing that the decision is invalid.  Korean Buddhist Dae Won

Sa Temple, 87 Hawai'i at 229, 953 P.2d at 1327.

In light of the Board's articulated reason for

discounting the study on which KNSC relies and KNSC's failure to

provide any evidence to controvert the Board's reasoning,

substantial evidence supports the Board's conclusion that the

5.0 m/s LWSC rate will minimize the take of 'ōpe'ape'a to the

maximum extent practicable.  In re Water Use Permit

Applications, 94 Hawai'i at 119, 9 P.3d at 431.  In turn, there

was no need for the Board to establish that a higher LWSC rate

was impracticable.

**2.  Substantial evidence supports the Board's conclusion that the Finalized Plan will increase the likelihood that 'ōpe'ape'a will survive and recover.**

KNSC also asserts that "[n]o actual studies or data

supported the Board's acceptance of representations that

protecting forests at Poamoho will 'increase the likelihood that

the species will survive and recover' as required by HRS § 195D-

4(g)(4)."  (Citation omitted.)

However, data in the record indicate that the

Finalized Plan's forest restoration provisions will increase

'ōpe'ape'a survival and recovery.  Citing the Committee's Hawaiian

Hoary Bat Guidance Document and the FWS's Recovery Plan for the

Hawaiian Hoary Bat, the Board attributed the reduction of

'ōpe'ape'a population to habitat loss, and identified the "main

43

potential threats" as "reduction in tree cover, loss of roosting habitat, [and] roost disturbance."  The Committee study showed that "[t]he best available information to date indicates that habitat restoration that enhances or increases forested and foraging areas for bats is an optimum mitigation approach as demonstrated in approved [habitat conservation plans] to date."  The Board determined that although the Poamoho Ridge forest already provided habitat for 'ōpe'ape'a, the forest was "declining because of feral pigs, which destroy vegetation, and invasive weeds."  Given the data before the Board and its findings, it stands to reason that actions that remove factors that contribute to the decline of 'ōpe'ape'a habitat will reduce, if not reverse, habitat loss, and thereby prevent roost disturbance and increase roosting habitat.  This is precisely what the Committee indicated that the best available information prescribes to support 'ōpe'ape'a recovery and survival.

Moreover, the Board found that the Wind Farm would "eliminate about one million tons of [carbon dioxide] over twenty years," "[carbon dioxide] is the most important greenhouse gas and contributor to global warming," and "global warming will be disastrous for wildlife."  The Board recognized that "[w]hile the [Wind Farm] will have only a small effect in the struggle against global warming . . . '[w]e cannot afford to ignore even modest contributions to global warming.'"  (Citation

omitted.)  In other words, while the Wind Farm would not completely prevent the harms global warming would visit upon ʻōpeʻapeʻa, it is one small step to reducing such harms.

As with its challenge to the Board's determination regarding the LWSC rate, KNSC does not point to any evidence that the Board did not base its decision on the best scientific and other reliable data available at the time of its determination.

Based upon the Board's uncontroverted findings, substantial evidence supports the Board's conclusion that the Finalized Plan will increase the likelihood that ʻōpeʻapeʻa will survive and recover.  In re Water Use Permit Applications, 94 Hawaiʻi at 119, 9 P.3d at 431.  Absent any evidence to undermine the Board's data and findings, KNSC does not satisfy its burden to show that the Board's decision was invalid.  Korean Buddhist Dae Won Sa Temple, 87 Hawaiʻi at 229, 953 P.2d at 1327.

3.  **Substantial evidence supports the Board's conclusion that it had sufficient information to adequately assess the cumulative impacts associated with the take of ʻōpeʻapeʻa.**

KNSC further argues the Board lacked sufficient information to assess the cumulative impacts associated with the take of ʻōpeʻapeʻa "[b]ecause it [(1)] relied solely on Kahuku Wind Project data, excluded consideration of other wind projects in the State, and [(2)] failed to analyze the impact of the

45

increased wind turbine generator [blade] length on ʻōpeʻapeʻa."
KNSC claims that in order for the Board to have sufficient data
to address both of these issues, the Board should have utilized
data from the Kawailoa Wind Project.[20]

> ### a. The Board's decision to exclude the Kawailoa Wind Project data on take quantity is not clearly erroneous.

During oral argument, KNSC insisted the Board
"disregard[ed] reliable data" from the Kawailoa Wind Farm
because it was inconsistent with approving the Finalized Plan.
KNSC added – for the first time – that consideration of the best
scientific and other reliable data available at the time of the
Board's determination required the Board "to account for all of
the data that is collected scientifically" and "account for all
of the factors that are observable."

KNSC mischaracterizes the Board's decision-making
process. The Board went to great lengths to evaluate the data
before it. Out of the Board's 349 findings of fact, 173
addressed issues KNSC raised about ʻōpeʻapeʻa. Rather than
disregarding the Kawailoa Wind Farm data, fifty-five findings –
approximately a third of the Board's ʻōpeʻapeʻa-related findings –
contemplated the applicability of the Kawailoa Wind Farm data.

---

[20]    To the extent KNSC believes the Board should have utilized data from
other Hawaiʻi wind farms, KNSC did not brief the issue before the Board and
provides no argument on the issue before this court. KNSC has therefore
waived any claims requiring data from other Hawaiʻi wind farms. Hawaiʻi Rules
of Appellate Procedure (HRAP) Rule 28(b)(4).

Through these findings, the Board identified a concern regarding the Kawailoa Wind Farm data: "Kawailoa has far more bat activity than Kahuku." For example, a study of the Kawailoa Wind Farm and the Kahuku Wind Farm determined the bat activity at the Kawailoa Wind Farm is anywhere between two to twenty times higher than at the Wind Farm's location. Similarly, "[p]re-2011 data also showed bat activity at Kawailoa about ten times that of Kahuku." Moreover, the annual reports from Kahuku and Kawailoa confirmed this distinction. The Board therefore concluded, "[t]he actual history of a wind farm operating on the adjacent land, with . . . similar levels of bat activity . . . is the better predictor of future take."

Considering the Board's detailed rationale for excluding the Kawailoa Wind Farm data, we cannot say that the Board's treatment of the data was unreasonable. In re Water Use Permit Applications, 94 Hawai'i at 154, 9 P.3d at 466. Substantial evidence therefore supports the Board's exclusion of the Kawailoa Wind Farm data. Id. at 119, 9 P.3d at 431.

KNSC's new argument that the Board is obligated to consider "all of the data that is collected scientifically" and "account for all of the factors that are observable" does not establish otherwise. Again, HRS chapter 195D requires the Committee and the Board to utilize the "best scientific and other reliable data available at the time of its determination."

HRS § 195D-21(c).  As our previous discussion indicates, not all scientifically collected information is necessarily reliable data or the best data.  To KNSC's point that the best scientific and other reliable data available must "account for all of the factors that are observable," it is that very accounting which allows experts to rule out certain information.  Returning to our example of the boiling point of water, determining the boiling point of water at the peak of Mauna Kea requires accounting for atmospheric pressure.  In turn, the fact that water boils at 100 degrees Celsius at sea level does not constitute the best data for determining the boiling point of water atop Mauna Kea.

Based on the Board's foregoing analysis, the Board reasonably established that the Kawailoa Wind Farm data is not the best available data because its higher levels of bat activity are not comparable to the Wind Farm's.  In contrast, KNSC effectively asserts the Board should disregard this undisputed finding and consider the Kawailoa Wind Farm data anyway.[21]

Under these circumstances, KNSC has not carried its burden to show that the Board's decision to exclude the Kawailoa

---

[21]    This flies in the face of KNSC's own demand that the best scientific and other reliable data available "account for all of the factors that are observable."

Wind Farm data was invalid.  <u>Korean Buddhist Dae Won Sa Temple</u>, 87 Hawai'i at 229, 953 P.2d at 1327.

> **b.  The Board analyzed the impacts of increased wind turbine blade length and height.**

Turning to KNSC's complaint that the Board "failed to analyze the impact of the increased wind turbine generator length on 'ōpe'ape'a," the record shows that the Board explicitly considered whether a wind turbine's height or blade length would affect take rates.

With regard to wind turbine height, the Board noted that a 2016 Canadian study found "no relationship between bat mortality and height of wind turbines."  Additionally, a 2009 Canadian study indicated that "[a]t sites with little bat activity . . . tower height is inconsequential."  In contrast, a 2007 study "found a very strong association between height and take, [but] had no data for towers between the height of Kahuku's and [Applicant's]."

As for wind turbine blade length, the Board found that "the two studies in the record which directly address this [issue] came to contrary conclusions."  Specifically, the 2007 study that found a strong association between height and take concluded that "[r]otor-swept area was not a significant factor in [its] analysis."  On the other hand, a different study

determined that "turbines with a bigger rotor-sweep area, mounted at the same height, did cause more bat fatalities."

Given the inconsistent data before it, the Board concluded

> The scientific evidence introduced at the contested case hearing does not establish that there is a direct correlation between either height or rotor-sweep area and bat mortality at the heights of [Applicant's] turbines. Even if there is, the conservative assumptions made by the [Finalized Plan] would more than accommodate an adjustment based on the greater height and rotor sweep area of [Applicant's] turbines vs. the Kahuku turbines.

Under these circumstances, the Board was entitled to rely on its expertise and experience to determine how to factor wind turbine height and blade length into its ʻōpeʻapeʻa take calculations. In re Water Use Permit Applications, 94 Hawaiʻi at 154, 9 P.3d at 466. KNSC does little more than disagree with the Board's conclusion that neither factor is relevant. Without any argument that the Board's determination was flawed, substantial evidence supports the conclusion that a wind turbine generator's height and blade length will not affect ʻōpeʻapeʻa take rates. Id. at 119, 9 P.3d at 431. We therefore see no reason to upset the Board's determination. Korean Buddhist Dae Won Sa Temple, 87 Hawaiʻi at 229, 953 P.2d at 1327.

## C. The Board did not err in relying on the Committee's recommendation.

KNSC next declares the Board's decision should be vacated because HRS chapter 195D prohibited the Board from

relying on the Committee's recommendation when the Committee did not conduct "an analysis of the changed wind turbine [blade] length." Specifically, KNSC implies the Committee never considered the impact of the increased wind turbine blade length on potential take estimates because Applicant increased the maximum wind turbine height to 200 meters during the Committee's review process.

However, the record shows the Committee was not only informed of Applicant's mid-review alterations to the Proposed Plan, but also actively considered Applicant's changes. Prior to the Committee's December 17, 2015 public meeting, Applicant submitted materials regarding its amendments to the Proposed Plan – including the maximum wind turbine height increase as well as additional fence construction funding to protect birds – to the Committee. At the start of the meeting, DOFAW staff talked the Committee through the proposed changes. During the meeting, Committee members requested more data on how the fence construction would ensure reduced bird take. Members also emphasized that continuous monitoring for ʻōpeʻapeʻa take was necessary to ensure the Applicant does not "miss a trigger."

Moreover, the Committee had time to consider the ramifications of the height increase. Again, Applicant submitted its materials including the height increase before December 17, 2015. The Committee subsequently recommended that

the Board approve the Finalized Plan – including the increased maximum wind turbine height – on February 25, 2016. Thus, the Committee had over two months to review Applicant's proposal as well as the potential impacts of the wind turbine height increase on 'ōpe'ape'a take.

In light of the foregoing, the Committee was aware of the proposed maximum wind turbine height increase and had the opportunity to review the change. We therefore presume that the Committee considered the amendment and determined that it would not result in more 'ōpe'ape'a take. See Korean Buddhist Dae Won Sa Temple, 87 Hawai'i at 229, 953 P.2d at 1327. Given that KNSC does not provide any evidence to the opposite effect, KNSC does not meet its burden to show the Committee erred. Id. In turn, there is no evidence that the Board erred in relying on the Committee's recommendation to approve the Finalized Plan. Id.

D.    **The Board correctly determined that Gon was not required to recuse himself from the Board proceedings.**

KNSC also claims this court should vacate the Board's decision to approve the Finalized Plan because Gon tainted the Board's decision-making process by first evaluating the Finalized Plan as a member of the Committee. Specifically, KNSC asserts that Gon's participation in the Board proceedings violated KNSC's constitutional right to due process because (1) there is an appearance of impropriety when a Board member

evaluates a habitat conservation plan application as a Committee member and (2) Gon expressed a bias in favor of the Finalized Plan. KNSC adds that Gon's participation also violated statutory prohibitions against Board members considering information not contained in the record. For the reasons discussed below, KNSC's insistence upon Gon's recusal is unwarranted.

1.  **Gon's participation in both the Committee and Board proceedings did not violate any statutory limitations.**

Turning first to KNSC's statutory argument, the statutory scheme of HRS chapter 195D and HRS § 171-4 indicates that a Board member may participate in both the Committee and Board proceedings without violating a statute.

a.  **The Legislature intended for the chairperson of the Board to participate in both the Committee and Board proceedings.**

As a preliminary matter, we note that the Legislature explicitly authorized the chairperson of the Board to participate in both the Committee and Board proceedings. Again,

> The committee shall consist of two field biologists with expertise in conservation biology, the chairperson of the board or the chairperson's designee, the ecoregion director of the United States Fish and Wildlife Service or the director's designee, the director of the United States Geological Survey, Biological Resources Division or the director's designee, the director of the University of Hawaii Environmental Center or the director's designee, and a person possessing a background in native Hawaiian traditional and customary practices.

(Emphasis added.) As a member of the Committee, the chairperson may evaluate proposed habitat conservation plans and make a

recommendation on whether the Board should approve, amend, or reject the proposal. HRS § 195D-25(b)(1). Next, as a member of the Board, the chairperson must vote on whether to approve, amend, or reject the same proposal. HRS §§ 171-4(e), 195D-4(g), 195D-21(b)(1). Thus, the Legislature explicitly authorized the chairperson of the Board to (1) make a recommendation as a member of the Committee on whether the Board should approve a habitat conservation plan, and (2) vote as the chairperson of the Board to approve or reject a habitat conservation plan. See also Liberty Dialysis-Hawaii, 130 Hawai'i at 104-06, 306 P.3d at 149-51.

> **b.** **The legislative history and language of HRS §§ 195D-25(a) and 171-4 indicates that the Legislature intended to authorize other Board members to participate in both the Committee and Board proceedings as well.**

Having established that the chairperson of the Board may participate in both the Committee and Board proceedings, we address whether the Legislature's authorization extends to other members of the Board. We conclude that it does.

First, the legislative history of HRS § 195D-25(a) indicates the Legislature intended for a member of the Board to participate in the Committee's proceedings. As initially designed, the Committee was a completely separate entity from the Board. The Legislature proposed the Committee consist of

> three private landowners, three field biologists, the
> administrator of the division of forestry and wildlife or

54

> the administrator's designee, the ecoregion director of the United States Fish and Wildlife Service or the director's designee, the director of the United States Geological Survey ("USGS"), Biological Inventory and Research Division or the director's designee, one representative from a local private conservation organization, one representative from the University of Hawaii Environmental Center, three academic experts in conservation biology, and three representatives from non-landowning environmental or Hawaiian organizations.

S.B. 1089, S.D. 1, 19th Leg., Reg. Sess. (1997).[22]

However, the Legislature received testimony that the "provision . . . gives far too much power to the head of the Division of Forestry and Wildlife <u>with too little Board . . . oversight</u>."  Hawaii Audubon Society, Testimony to the Senate Committee on Ways and Means on S.B. No. 1089, 19th Leg. Reg. Sess. (Feb. 21, 1997) (emphasis added).  Another commenter suggested, instead, that "[t]he duties of the recovery committee are properly performed by the Board of Land and Natural Resources."  Kamehameha Schools Bernice Pauahi Bishop Estate, Testimony to the Senate Committee on Ways and Means on S.B. No. 1089, 19th Leg., Reg. Sess. (Feb. 21, 1997).  The Board's chairperson suggested, as an alternative, that the Legislature "designate the chairperson of the board of land and natural resources or his designee as the recovery committee member

---

[22]    The legislature ultimately enacted the endangered species statute using H.B. 1292, H.D. 1, S.D. 1, C.D. 1, 19th Leg., Reg. Sess. (1997) as the legislative vehicle.  <u>See</u> 1997 Haw. Sess. Laws Act 380, at 1193-206.  However, this only occurred after the senate replaced the text of H.B. 1282, H.D. 1, 19th Leg., Reg. Sess. (1997) with the text of S.B. 1089, S.D. 2, 19th Leg., Reg. Sess. (1997).  S. Stand. Comm. Rep. No. 1183, in 1997 Senate Journal, at 1343.

rather than the administrator of the division of forestry and wildlife." Board of Land and Natural Resources, Testimony to the Senate Committee on Ways and Means on S.B. No. 1089, 19th Leg., Reg. Sess. (Feb. 21, 1997).

The Legislature subsequently amended the bill to, inter alia, "[s]ubstitut[e] the Chair of the Board for the Administrator of the Division of Forestry and Wildlife on the Committee." S. Stand. Comm. Rep. 827, in 1997 Senate Journal at 1220. However, the Legislature retained the provision allowing the chairperson to designate someone else to represent her on the Committee. S.B. 1089, S.D. 2, 19th Leg., Reg. Sess. (1997). It therefore appears the Legislature amended the bill to allow the Board to play a role in the Committee's proceedings and to oversee directly the Committee's work.

Second, reading HRS § 195D-25(a) in conjunction with HRS § 171-4 indicates the Legislature did not intend to restrict its authorization for a person to participate in both the Committee and Board proceedings to the Board's chairperson. Again, HRS § 195D-25(a) authorizes the chairperson of the Board to have a designee take her place on the Committee. However, it does not place any restrictions on who can be a designee. The statute therefore does not prohibit the chairperson of the Board from designating another Board member to serve on the Committee.

Moreover, the fungible nature of the chairperson position indicates the Legislature recognized that any of the Board's members may be called upon to serve on both the Committee as well as the Board. Under HRS § 171-4(a),

> The board of land and natural resources shall be composed of seven members, one from each land district and three at large, to be nominated and, by and with the advice and consent of the senate, appointed by the governor as provided in section 26-34. The term and removal of a member of the board and the filling of a vacancy on the board shall also be as provided in section 26-34. There shall be not more than three members on the board from the same political party.

Additionally, according to HRS § 171-4(e),

> The governor shall select a chairperson of the board from among its members. The chairperson shall call and preside at meetings and may appoint a member of the board as secretary. The members of the board shall choose one of their number to act as chairperson during the absence or disability of the chairperson.

In light of the foregoing, each of the Board's members may be called upon to serve as the chairperson at any given time. The governor selects the chairperson from the pool of senate-confirmed Board members and may replace the chairperson with a different Board member. HRS § 171-4(e). However, if the governor-selected Board member is unable to carry out the chairperson's duties, the Board's members may designate any of the remaining Board members to act as the chairperson. Id.

This fungibility is particularly important where, as here, the Committee and the Board's reviews of the habitat conservation plans occurs sequentially. This creates a situation where two or more Board members may serve as the

57

chairperson throughout the relevant proceedings.  For instance, Board member A may serve as the chairperson during the Committee's review and be replaced by Board member B as the chairperson during the Board's review, but remain on the Board during the Board's review.[23]  In such a situation, restricting the Legislature's authorization to the chairperson of the Board could preclude the Board from reviewing and/or approving any habitat conservation plan.  See HRS §§ 171-5 (2011) (providing in relevant part that "Four members of the board shall constitute a quorum to do business."), 195D-21(b)(1) (requiring "an affirmative vote of not less than two-thirds of [the Board's] authorized membership," or five Board members, for approval).

Accordingly, we read HRS §§ 195D-25(a) and 171-4(e) to authorize other Board members to participate in both the Committee and Board proceedings.

c. **HRS §§ 91-9(g) and 91-13 do not prohibit Board members from considering information obtained during the Committee proceedings.**

In light of the Legislature's intention for Board members to participate in the Committee proceedings, the statutory prohibitions against considering extra-record

---

[23]    To further complicate matters, the governor may replace the chairperson during either of these review processes.  Id.  Alternatively, the Board's members may select an acting chairperson due to "absence or disability."  Id.

information do not preclude Board members from considering information obtained from the Committee proceedings.

According to KNSC, HRS §§ 91-9(g) and 91-13 precluded Gon from considering "extra-record" information he obtained during the Committee proceedings. However, the requirements of HRS chapter 195D and HRS § 171-4(e) conflict with those of HRS §§ 91-9(g) and 91-13.

Pursuant to HRS § 91-9(g) (2012), "[n]o matters outside the record shall be considered by the agency in making its decision except as provided herein." Additionally, HRS § 91-13 (2012) provides that "[n]o official of an agency who renders a decision in a contested case shall consult any person on any issue of fact except upon notice and opportunity for all parties to participate, save to the extent required for the disposition of ex parte matters authorized by law." However, if a Board member's exposure to information obtained during the Committee proceedings requires disqualification from the Board proceedings, the chairperson of the Board would have to recuse herself from the Board proceedings despite HRS chapter 195D's express authorization for the chairperson to participate in both proceedings. See HRS §§ 195D-4(g), 195D-21(b), 195D-25(a). Thus, the text of HRS §§ 91-9(g) and 91-13 conflicts with that of HRS § 195D-25(a).

59

The requirement of HRS chapter 195D and HRS § 171-4(e) that a Board member participate in both proceedings overrides the prohibitions of HRS §§ 91-9(g) and 91-13. "[W]here there is a 'plainly irreconcilable' conflict between a general and a specific statute concerning the same subject matter, the specific will be favored." Mahiai v. Suwa, 69 Haw. 349, 356, 742 P.2d 359, 366 (1987) (citations omitted). In this case, HRS §§ 195D-25(a) and 171-4(e) provide the more specific language because the statutes apply to Committee and Board proceedings in particular, whereas HRS §§ 91-9(g) and 91-13 apply to all contested case hearings. Under such circumstances, HRS §§ 91-9(g) and 91-13 do not preclude Board members who participated in the Committee proceedings from using information obtained during the Committee proceedings in the Board proceedings. See id.

In turn, KNSC does not identify any statutory basis for Gon's recusal.

**2. Gon's participation in both the Committee and Board proceedings did not raise any due process issues.**

Turning to KNSC's due process claims, KNSC argues that because Gon served on the Committee, he improperly prejudged whether the Board should approve the Finalized Plan. KNSC intimates such prejudgment created an appearance of impropriety, and due process therefore required Gon's recusal. KNSC

60

additionally avers that Gon was biased in favor of approving the Finalized Plan.

Under the Hawai'i Constitution, "[n]o person shall be deprived of life, liberty or property without due process of law . . . ." Haw. Const. art. I, § 5. However, "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972); see also Mauna Kea Anaina Hou v. Bd. of Land and Natural Res., 136 Hawai'i 376, 389, 363 P.3d 224, 237 (2015). We hold that when the Legislature structures an administrative agency to perform multiple roles, due process does not require the agency or its members to sacrifice one function to accomplish another. Gon's participation in the Committee therefore did not disqualify him from the Board's proceedings.

Furthermore, where a challenger asserts an agency adjudicator is disqualified by bias, the challenger must overcome a "presumption of honesty and integrity." Sifagaloa v. Bd. of Trustees of Emps.' Ret. Sys., 74 Haw. 181, 192-93, 840 P.2d 367, 372-73 (1992) (quoting Wolkenstein v. Reville, 694 F.2d 35, 42 (2d Cir. 1982)). KNSC does not meet this burden.

### a. Agency adjudicators may participate in sequential proceedings without violating due process.

KNSC asserts that Gon's recusal is warranted because he "publicly expresse[d] a predisposition" when he recommended

61

that the Board approve the Finalized Plan and because he prejudged "disputed issued [sic] of adjudicative fact." However, the mere fact that Gon expressed a position on the Finalized Plan as a function of his membership on the Committee does not require his recusal.

As a preliminary matter, the fact that a decision-maker previously adjudicated an issue does not mean that they will improperly prejudge subsequent proceedings on the same issue. For instance, when this court reverses a lower court's decision, we generally remand the matter to the same judge or panel for further proceedings. See State v. Ortiz, 91 Hawai'i 181, 196, 981 P.2d 1127, 1142 (1999) ("Absent 'unusual circumstances'—such as those presented by a judge's failure to grant a defendant his or her presentence right of allocution—or 'personal bias,' remand to a different trial judge is uncalled for.") (citation omitted). This court also regularly remands agency decisions with instructions for the agency to reconsider issues they already passed upon. See, e.g., Mauna Kea Anaina Hou, 136 Hawai'i at 399, 363 P.3d at 247 (remanding for Board to reconsider issuing a land use permit); Kilakila 'O Haleakala v. Bd. of Land & Natural Res., 131 Hawai'i 193, 196, 317 P.3d 27, 30 (2013) (same). Notably, this is the precise relief KNSC demands in this case: a remand to the Committee and Board to reconsider the Finalized Plan. By KNSC's reasoning, however, any Board

member who voted on the Finalized Plan would be recused on the requested remand.

Rather, when an agency decision-maker expresses a position on an issue as a function of carrying out his statutory obligations, due process does not require the decision-maker's recusal in a subsequent proceeding on the same issue.  The federal courts' analysis on the matter is persuasive.

In 1948, the Cement Institute called for the United States Supreme Court to disqualify the Federal Trade Commission (FTC) from adjudicating unfair trade proceedings on a specific trade practice because the FTC previously issued a congressionally-mandated report concluding that the trade practice was illegal.  Federal Trade Comm'n v. Cement Institute, 333 U.S. 683, 700-03 (1948).  However, the Court rejected Cement Institute's contention that the FTC's prior findings constituted improper prejudgment, reasoning that "the fact that the [FTC] had entertained such views as the result of its prior ex parte investigations did not necessarily mean that the minds of its members were irrevocably closed on the subject of the respondents' [trade] practices."  Id. at 701 (emphasis added).  The Court pointed out that, instead, members of the cement industry had the opportunity to "produce[] evidence—volumes of it.  They were free to point out to the [FTC] by testimony, by cross-examination of witnesses, and by arguments, conditions of

the trade practices under attack which they thought kept these practices within the range of legally permissible business activities." Id.

The Court added that requiring disqualification simply because the FTC had considered a similar issue previously flies in the face of administrative law principles. Id. at 702. Specifically,

> If the [FTC's] opinions expressed in congressionally required reports would bar its members from acting in unfair trade proceedings, it would appear that opinions expressed in the first . . . unfair trade proceeding would similarly disqualify them from ever passing on another. Thus experience acquired from [the adjudicators'] work as commissioners would be a handicap instead of an advantage. Such was not the intendment of Congress. For Congress acted on a committee report stating: "It is manifestly desirable that the terms of the commissioners shall be long enough to give them an opportunity to acquire the expertness in dealing with these special questions . . . that comes from experience."

Id. (citation omitted). The United States Supreme Court thereby laid the foundation for the principle that a legislature's intent guides whether due process requires an agency adjudicator's recusal when the adjudicator previously made related determinations.

Building upon the United States Supreme Court's analysis, the United States Court of Appeals for the First Circuit articulated that there is no improper prejudgment or due process violation when an agency carries out multiple related, congressionally-required proceedings. Pangburn v. Civil Aeronautics Bd., 311 F.2d 349, 358 (1st Cir. 1962). There,

64

Sheldon Pangburn asserted the Civil Aeronautics Board's (CAB) determination that Pangburn's "pilot error" caused a crash in a statutorily-mandated Accident Investigation Report improperly predetermined the results of the CAB's investigation into whether to affirm the Federal Aviation Agency (FAA) Administrator's order suspending Pangburn's airline transport pilot rating.  Id. at 355.  The court disagreed.

The court initially emphasized that both of the CAB's proceedings were congressionally authorized.  On the one hand, Congress required the CAB to "investigate accidents involving civil aircraft and 'report the facts, conditions, and circumstances . . . and the probable cause thereof.'"  Id.  On the other, a related statute allowed the CAB "to entertain and decide appeals from revocation or suspension orders [of] the [FAA] Administrator."  Id. at 356.  The court thereby noted that, "in both proceedings, the [CAB] is acting under a Congressional mandate to perform the functions which were in fact performed here."  Id.

The court further recognized that "[i]t is well settled that a combination in investigative and judicial functions within an agency does not violate due process."  Id. Thus, the Court concluded that

> we cannot say that the mere fact that a tribunal has had contact with a particular factual complex in a prior hearing, or indeed has taken a public position on the facts, is enough to place that tribunal under a

> constitutional inhibition to pass upon the facts in a subsequent hearing. We believe that more is required. Particularly is that so in the instant case where the [CAB's] prior contact with the case resulted from following the Congressional mandate to investigate and report the probable cause of all civil air accidents. If we were to accept [Pangburn's] argument, it would mean that because the [CAB] obeyed the mandate of [one statute], it was thereupon constitutionally precluded from carrying out its responsibilities under [another].

Id. at 358 (emphasis added). Thirteen years later, the United States Supreme Court approvingly cited the United States Court of Appeals for the First Circuit's analysis in Withrow v. Larkin, 421 U.S. 35, 50 n.16 (1975).

The federal courts' analysis is applicable to the present case. As in Pangburn, Gon acted under multiple statutory obligations in evaluating the Finalized Plan – first as a member of the Committee under HRS § 195D-25(b)(1), and later as a member of the Board under HRS §§ 195D-4(g) and 195D-21. See 311 F.2d at 355-56. Gon's recommendation that the Board approve the plan did not mean his mind was "irrevocably closed" on the matter. See Cement Institute, 333 U.S. at 701. Instead, like Cement Institute, KNSC was allowed to "produce[] evidence—volumes of it. They were free to point out to the [Board] by testimony, by cross-examination of witnesses, and by arguments" why the Board should reject the Finalized Plan. Id. Accepting KNSC's argument would mean that because Gon obeyed the mandate of HRS § 195D-25(b)(1), he was constitutionally

precluded from carrying out his responsibilities under HRS §§ 195D-4(g) and 195D-21. See Pangburn, 311 F.2d at 358.

When the Legislature calls upon an administrative agency and its members to perform multiple roles, due process does not require the agency or its members to sacrifice one function to accomplish another. See id. Due process therefore did not require Gon's recusal.[24]

> **b.  KNSC does not carry its burden to show that Gon acted without honesty or integrity.**

Having fallen short of establishing that Gon's work on the Committee disqualified him from participating in the Board's proceedings, KNSC next claims that three of Gon's statements constitute evidence of bias in favor of the Finalized Plan. Specifically, (1) prior to voting against a contested case hearing, Gon stated that "[t]he suggestion that the habitat conservation plan is fatally flawed or inadequate[ly] researched [is] problematic in his mind"; (2) following the contested case hearing, Gon commented that "turning this HCP back [to] the ESRC at this stage, mere months after its issuance and approval, is not going to result in any – in any significant change in the

---

[24]  In light of Gon's statutory obligations, KNSC's citation to American Cyanamid Co. v. FTC, 363 F.2d 757 (6th Cir. 1966) in support of its demand for Gon's recusal is inapposite. There, "one of the commissioners had previously served actively as counsel for a Senate subcommittee investigating many of the same facts and issues before the [FTC] for consideration." Withrow, 421 U.S. at 50 n.16. Thus, unlike the present case, the commissioner's prejudgment did not arise from a statutory obligation. See id.

information that has already been considered by the ESRC and by the state and federal agencies"; and (3) in responding to KNSC's motion to disqualify Gon, Gon made an allegedly inconsistent disclosure regarding the extent of his work on the Committee.

However, not one of these statements indicates bias on Gon's part. First, the pre-contested case hearing statement reflects a principle of review for agency decisions: "the agency's decision carries a presumption of validity and appellant has the heavy burden of making a convincing showing that the decision is invalid . . . ." Korean Buddhist Dae Won Sa Temple, 87 Hawaiʻi at 229, 953 P.2d at 1327. Gon's complete observation was that

> when a habitat conservation plan is put together it has to pass the [U.S.] Fish and Wildlife Service and the DLNR. The suggestion that the habitat conservation plan is fatally flawed or inadequate[ly] researched [is] problematic in his mind.

By prefacing his statement with an acknowledgement of the work conducted by both FWS and DOFAW, Gon pointed out that the Finalized Plan was the product of significant government agency scrutiny. These proceedings and their resulting product carry a presumption of validity. See id. Taken in context, this statement does not indicate bias.[25]

---

[25]    Notably, KNSC appears to recognize that Gon's statement does not require recusal. "Member Gomes said he agreed with Member Gon." However, KNSC never moved to disqualify Member Gomes.

Second, the post-contested case hearing statement reflects the state of the evidence before the Committee and the Board. The Committee unanimously recommended that the Board approve the Finalized Plan on February 25, 2016. A review of the record indicates KNSC submitted six studies published after the Committee's recommendation. However, none of these submissions indisputably controverted the information the Committee had already considered. Thus, it does not appear KNSC identified any new evidence the Committee was required to consider, much less evidence that constituted a "significant change in the information that has already been considered by the ESRC . . . ."

Third, Gon's disclosures were not inconsistent and, in any event, did not prejudice KNSC. To reiterate, Gon initially disclosed on November 10, 2016 "that he was briefly on the endangered species advisory committee that advises windfarm projects. He is no longer on that committee and this particular company and proposal was not one that he provided substantial input to." On February 21, 2018, Gon's disclosure explained "I was invited to serve on the ESRC of the DLNR, where, with other experts and agency managers of endangered species, we considered the impacts and mitigation recommendations for various projects of relevance to the DLNR. While on the ESRC, I considered the [habitat conservation plan] at issue currently." These

disclosures are consistent. The fact that Gon considered the Finalized Plan and moved for the Committee to recommend that the Board approve the Finalized Plan and voted accordingly does not mean he provided substantial input on the Finalized Plan. By contrast, other Committee members identified specific issues in the Proposed Plan for Applicant to address in the Finalized Plan.

Furthermore, KNSC does not identify any prejudice resulting from the alleged inconsistency. As our foregoing discussion illustrates, KNSC's concerns with Gon's participation in the Board proceedings arise from the fact that he also participated in the Committee proceedings. Thus, to the extent Gon's February 2018 disclosure revealed any additional information about his work on the Committee, Gon's November 2016 disclosure already furnished KNSC with sufficient information to identify the challenges it has raised throughout these proceedings.

Under these circumstances, KNSC has not carried its burden to overcome the presumption that Gon acted with honesty and integrity. See Sifagaloa, 74 Haw. at 192-93.

E. **KNSC waived its challenge to State Senator Inouye's communications.**

Lastly, KNSC asserts that State Senator Lorraine Inouye's letter to the BLNR constituted an improper ex parte

communication and that BLNR's failure to provide the letter to KNSC rendered the Board's approval of the Finalized Plan and License void.  However, KNSC did not timely object regarding the letter, and has therefore waived any challenge thereon.

"[T]he general rule that an appellate court will consider only such questions as were raised and reserved in the lower court applies on review by courts of administrative determinations so as to preclude from consideration questions or issues which were not raised in administrative proceedings." Waikiki Resort Hotel, Inc. v. City & Cnty. of Honolulu, 63 Haw. 222, 250, 624 P.2d 1353, 1372 (1981) (citing Petition of Village Bd. of Wheatland, 42 N.W.2d 321 (N.D. 1950)).  KNSC conceded during oral argument that it did not raise any objection to Senator Inouye's letter during the BLNR proceedings.  We therefore do not resolve this assertion.

Nevertheless, we take this opportunity to reiterate that "[i]n future contested case hearings, BLNR could certainly do more to remove doubts of impropriety and build confidence in its permit approval process."  Kilakila 'O Haleakala, 138 Hawai'i at 401, 382 P.3d at 213.  KNSC contends the Board should have at least retained a copy of the letter, even if it was prohibited from considering the letter's contents during the proceedings. We agree.

Pursuant to Hawai'i Administrative Rules (HAR) § 13-1-16 (2009), "[a]ll documents filed with or presented to the board may be retained in the files of the board."  The disclosure and maintenance of potentially objectionable communications would increase confidence in the Board's proceedings.  See Kilakila 'O Haleakala, 138 Hawai'i at 417, 382 P.3d at 229 (Pollack, J., dissenting).  We therefore respectfully suggest that the Board develop procedures to retain documents submitted to, but not considered by, the Board during contested case hearings.[26]

## IV.  CONCLUSION

In summary, substantial evidence supported the Board's decision to approve the Finalized Plan because both the Board and the Committee utilized the best scientific and other reliable data available at the time of their respective determinations.  Furthermore, neither due process nor any statutory provision disqualified Gon from complying with his statutory obligations and sequentially participating in the Committee and Board proceedings.  Finally, we do not consider the merits of KNSC's ex parte communications argument because KNSC did not raise a timely objection.

---

[26]   Although such documents may become a part of the contested case hearing record by virtue of being "on file with the [B]oard," "any party may object, in the manner provided in [HAR] section 13-1-35, to any part of such record." See HAR § 13-1-32.4 (2009).

Accordingly, we affirm the circuit court's May 23, 2019 Final Judgment, which affirmed the Board's May 18, 2018 Findings of Fact, Conclusions of Law, and Decision and Order.

Lance D. Collins
and Bianca Isaki
for Appellant-Appellant

Ewan C. Rayner (Kimberly T.
Guidry, William J. Wynhoff,
Linda L.W. Chow, and Cindy Y.
Young on the briefs) for
Appellees-Appellees Board of Land
and Natural Resources, Department
of Land and Natural Resources,
and Suzanne D. Case in her
official capacity as Chairperson
of the Board of Land and Natural
Resources

John P. Manaut (Puananionaona P.
Thoene with him on the briefs)
for Appellee-Appellee Na Pua
Makani Power Partners, LLC

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Michael D. Wilson

/s/ Matthew J. Viola

